UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
| STEVEN NEIL KENDALL ) | Case No. 05-14772-SSM |
| ) | Chapter 7 |
| Debtor ) | |
| ) | |
| HUGH C. MOORE, *et al.* ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| vs. ) | Adversary Proceeding No. 06-1028 |
| ) | |
| STEVEN NEIL KENDALL ) | |
| ) | |
| Defendant ) | |

**MEMORANDUM OPINION**

This is an action to determine the dischargeability of a $30,000.00 loan made by the plaintiffs, Hugh C. Moore and Sarah H. Moore, to the defendant, Steven Neil Kendall. At the conclusion of the plaintiffs' evidence, the defendant moved for judgment on partial findings under Rule 7052, Federal Rules of Bankruptcy Procedure and Rule 52(c), Federal Rules of Civil Procedure. After the court deferred a ruling on the motion until the close of all the evidence, the defendant rested without presenting any evidence. The court then took the issues under advisement in order to review the evidence and the applicable law. For the reasons stated, the motion for judgment on partial findings is denied, and judgment will be entered for the plaintiffs determining the debt to be nondischargeable.

1

Background

Steven Neil Kendall ("the debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this court on October 13, 2005, and received a discharge of his dischargeable debts on January 27, 2006.

The plaintiffs, Hugh C. Moore and Sarah H. Moore, live near the debtor and his business partner, Mary Ann Kelly. Mr. Moore operates a small advertising and graphics design business. Mrs. Moore is a retired school teacher. The debtor and Ms. Kelly operated a luxury used car business called Auto Wholesale, Inc., with Ms. Kelly serving as president of the company and Mr. Kendall as vice-president. At the time of the loan, the Moores had known the debtor and Ms. Kelly for approximately one and a half years. Ms. Kelly and Mrs. Moore met while walking dogs, and Mr. Moore had allowed the debtor to park a 2001 silver Mercedes-Benz automobile in his driveway because, the debtor told him, the tires on the vehicle had been slashed when it had been stored in the debtor's own driveway.

On April 18, 2005, the debtor and Ms. Kelly came over to the Moores' house to discuss a proposed loan. The debtor explained that he needed a loan of $30,000 in order to post a $250,000 bond that was required so that he could purchase vehicles at automobile auctions, and that without the bond, he could not keep his employees and would have to close the business. Although Mrs. Moore was reluctant to make such a loan, Mr. Moore, as a small businessman himself, wanted to help the debtor provided there was no risk. In any event, the Moores ultimately agreed to loan the debtor $30,000.00, repayable with 20% interest ($6,000.00) in 90 days, secured by the 2001 silver Mercedes-Benz that was already sitting in the Moores' driveway. The debtor orally represented to Mr. Moore that the vehicle

2

was worth $50,000.00 and that, if necessary, he would take $36,000 for it. In connection with the loan, the debtor executed two documents: a note and a sales contract. The note recited,

> I Steven N. Kendall hereby agree to pay Hugh and Sarah Moore (and or survive [*sic*]) the sum of $30,000 dollars plus interest of 20% for ninety days for the total amount of $36,000 dollars.
>
> I am putting up as collateral for this loan a 2001 Silver Mercedes Benz SL500.
>
> Vin Number: WDBFA68F11F198118
>
> Mileage: 31,217
>
> The Sales Receipt for this automobile is in Mr. Moore's possession with an active date of July 18, 2005 with a balance due on delivery of -0- dollars.

Pls. Ex. 1  The sales contract appears to be a standard form automobile sale contract ("Buyer's Order"), dated July 18, 2006 (the due date of the note), with the Moores as purchasers of the 2001 silver Mercedes Benz for a price of $30,000.00. Mrs. Moore gave the debtor a $30,000 check that day. The key to the vehicle had previously been given to Mr. Moore (so that he could move the car if necessary) and he retained the key following the loan. The license plates on the vehicle were also removed, although it is unclear from the testimony whether that was done the day the loan was made or had been done previously.

Unbeknown to the Moores at the time the loan was made, the vehicle was subject to a lien in favor of Mercedes-Benz Credit Corporation. Mercedes Benz Credit had financed the debtor's purchase of the car in April 2001. The original amount of the loan was $79,846.14, repayable in 60 monthly payments of $1,195.00 each beginning May 30, 2001, with a final balloon payment in the 61st month in the amount of $40,831.20. The exact balance due four years later when the Moores made their loan is unclear from the evidence, but, absent

3

pre-payment, would necessarily have been some amount in excess of the balloon payment. That there was no pre-payment appears clear from a statement dated April 11, 2006—nearly one year after the loan was made—showing a payoff amount of $43,158.21. The court finds, therefore, that there was at least $45,000 due on the vehicle at the time the Moore loan was made. The debtor did not disclose the existence of the lien to Mr. Moore, who testified that he had no reason to suspect there was a lien because the car was more than four years old, and he was not aware that lenders were making car loans longer than four years.

Several weeks after the loan was made, the debtor requested that Mr. Moore let him take the vehicle so that he could have it cleaned ("detailed") and could show it to a prospective purchaser. When Mr. Moore asked him what protection he would have if he relinquished the automobile and the debtor were to turn around and sell it, the debtor said, "I will write you a check." Mr. Moore allowed him to take the automobile. The debtor never returned the vehicle, and some two months later, on July 3, 2005, sold it to an out-of-state couple for $41,900. Pls. Ex. 12. No portion of the sales proceeds were paid to the Moores, and the Moores have never received any payment on their loan. Curiously, the title certificate at the time the vehicle was sold reflects that the lien in favor of Mercedes Benz Credit had been satisfied on May 17, 2005. The lien release was evidenced by a letter, purporting to be signed by a loan officer of Mercedes Benz Credit, certifying that the lien had been satisfied. Pls. Ex. 8. The same signature appears in the block for recording lien releases on what appears to be the original certificate of title. Pls. Ex. 9. Why Mercedes Benz Credit would have released the lien when an account statement issued a year later showed more than $43,000 was still owed on the car is unexplained. Pls. Ex. 11.

Conclusions of Law and Discussion

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  An action to determine the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge. 28 U.S.C. § 157(b)(2)(I).  Venue is proper in this district under 28 U.S.C. § 1409(a).  The defendant has been properly served and has appeared generally.

II.

A chapter 7 discharge does not discharge an individual debtor from debts:

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>     (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>     (B) use of a statement in writing—
>         (i) that is materially false;
>         (ii) respecting the debtor's or an insider's financial condition;
>         (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>         (iv) that the debtor caused to be made or published with intent to deceive.

§ 523(a)(2), Bankruptcy Code.  It is important to note that different standards apply depending on whether the false statement is one "respecting the debtor's ... financial condition." *Id.*  If it is, the statement must be in writing and the creditor must have "reasonably" relied on it.  § 523(a)(2)(B), Bankruptcy Code.  Other types of misrepresentations need not be in writing and the creditor's reliance need only be "justifiable," which is a lesser standard than "reasonable."  § 523(a)(2)(A), Bankruptcy Code;

*Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). To show actual fraud under § 523(a)(2)(A), the creditor must prove the following elements: "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999). The burden of proof is on the plaintiff, and the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

A.

Although it was not entirely clear at trial what specific representations the plaintiffs contend were fraudulent, the evidence centered on the representation that plaintiffs would have the silver Mercedes Benz as collateral and the subsequent representation that the debtor needed to take the car so that he could have it detailed and shown to a prospective purchaser.

The difficulty with the first representation is that neither the note nor the sales contract—which are the only writings—make any express representation concerning the presence or absence of liens on the vehicle. Although the vehicle was four years old, it had been financed with a 5-year balloon payment loan. The only evidence in the record as to the value of the vehicle is (a) the statement the debtor made to Mr. Moore that the vehicle was worth $50,000, but that he would take $36,000 if necessary, and (b) the certificate of title showing that it was sold several months later for $41,900. The actual sales price seems the best indication of value, and the court will assume the vehicle was worth $41,900. However, it was encumbered by a lien in favor of Mercedes Benz Credit for an amount that at that time was more than $43,000. Hence, putting aside the question of whether there was an effective

6

pledge of the vehicle as collateral when the lien was never recorded on the certificate of title, the value of the collateral, at the time the Moores made the loan, was effectively zero.

It is of course true that the debtor, by orally representing the vehicle to be worth at least the amount of the loan, also at least implicitly represented that it was fee of liens. In this circuit, however, a representation that collateral is free of liens is treated as a statement respecting financial condition and must be in writing in order to be actionable as a basis for excluding a debt from discharge. *Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060 (4th Cir. 1984). Since in this case the representation that the silver Mercedes Benz was free of liens was at best oral or implied, but not written, its falseness cannot serve as a basis for nondischargeability, however censurable the debtor's conduct might otherwise appear.

B.

The other representation—that the debtor needed to take the silver Mercedes Benz in order to have it detailed and to show it to a potential purchaser, and that he would "write [Mr. Moore] a check" when the vehicle was sold—does not suffer from the same infirmity, as it is not a statement respecting financial condition. However, even a deliberate failure to keep a promise does not constitute fraud unless, *at the time the promise was made*, the debtor had no intention of performing. An unexplained failure to perform can nevertheless constitute evidence of lack of intent to perform. Here, the debtor took the vehicle, kept it for an extended period, sold it without telling the Moores, and did not pay the Moores a dime out of the proceeds. Notably, the debtor—who was in the best position to explain what his intent was when he asked for the vehicle and why he did not pay the Moores from the sales

proceeds—chose not to testify. The court can only assume, therefore, that his testimony would not have been favorable to his position.

The debtor argues, however, that even if the Moores justifiably relied on a false promise that they would be paid out of the sales proceeds, they can show no damages. The loan itself, as the debtor notes, had already been made several weeks earlier, so that the representation was not an inducement to make the loan. More to the point, he argues, since the vehicle was encumbered in excess of its value, the Moores suffered no loss—or, more accurately, only the loss of something worthless—even if the court were to find that they had been tricked into parting with the collateral. The court must disagree. Although the circumstances surrounding the release of the Mercedes Benz Credit lien are puzzling, to say the least, it seems clear that the debtor was able to effect the removal of the lien from the title at or about the time he obtained possession of the vehicle from the Moores. With the lien released, the vehicle had more than sufficient value to cover the amount due on the loan made by the Moores and indeed was sold two months later for more than enough to pay off the loan. Certainly the debtor—who has elected not to present any evidence—has provided the court with no reason to believe there is a non-culpable explanation for the failure to pay the loan out of the sales proceeds, and the court can discern no such explanation from the evidence that is in the record.

There is an additional issue, which is whether the Moores actually had a lien against the vehicle. The court concludes that they did, although not one that was perfected against third parties. The language in the note, "I am putting up as collateral for this loan a 2001 Silver Mercedes Benz SL500," together with the execution and delivery of the post-dated

sales contract for the vehicle, was sufficient to create a security interest. For a security interest in a motor vehicle to be perfected against a third party without notice, however, the lien must be recorded on the face of the title. Va. Code Ann. § 46.2-638. But the absence of perfection simply means that the lien cannot be enforced against a third party; it does not affect the secured creditor's right to enforce it against the debtor. So long as Mr. Moore retained physical possession of the vehicle, he was protected as a practical matter against sale of the vehicle to a bona fide purchaser. Only when he was induced to part with physical possession was his ability to enforce his lien effectively eviscerated. For that reason, the court concludes that the Moores have carried their burden of showing, by a preponderance of the evidence, that the debtor obtained property—the pledged automobile that was securing their loan—by false pretenses, and that they suffered loss measured by the lesser of the value of the collateral or the amount due on the loan. The value of the collateral, the court has found, was $41,900, while the amount due on the loan was no more than $36,000.[1] Accordingly, the measure of damages is the amount due on the loan.

There remains one final issue, which is the amount, if any, to be awarded as prejudgment interest. In Virginia, whether, and from what date, to award prejudgment interest is discretionary with the court. Va. Code Ann. § 8.01-382. In this case, the actual amount loaned was $30,000, repayable 90 days later with interest of $6,000. This equates to 20% for the 90 days, or 80% per annum. Since the loan was undisputably for business purposes, it is not subject to the Virginia usury statute, which otherwise would limit interest

---

[1] Mr. Moore testified that he believed the full $6,000 of interest would be due even if the loan were repaid prior to the 90 days. Because the loan was not prepaid, the court need not resolve the issue.

to 12% per annum. Va. Code Ann. § 6.1-330.55. The court nevertheless believes that an award of prejudgment interest computed at 80% per annum would be excessive, and the court elects to allow prejudgment interest through loan maturity at the contract rate but to compute interest subsequent to maturity using the current Virginia judgment rate of 6%. Va. Code Ann. § 6.1-330.54; *see Lambert v. Callahan (In re Lambert Oil Co., Inc.)*, 347 B.R. 508 (W.D. Va. 2006) (computing prejudgment interest on loan using Virginia judgment rate in effect at time of judgment). So computed, prejudgment interest totals $8,421.37, and the total judgment to be awarded to the plaintiffs is $38,421.37.[2]

    A separate judgment will be entered consistent with this opinion.

Date: _____       _____
                                    Stephen S. Mitchell
Alexandria, Virginia                United States Bankruptcy Judge

---

[2] The computation is as follows:

| | | |
|---|---:|---:|
| Principal | | $ 30,000.00 |
| Interest to maturity | | $  6,000.00 |
| Rate post-maturity | 6% | |
| Per Diem | $ 4.93 | |
| Maturity date | 7/18/2005 | |
| Judgment Date | 11/21/2006 | |
| Days | 491 | |
| Interest post-maturity | | $  2,421.37 |
| Total Judgment | | $ 38,421.37 |

Copies to:

Peter C. Williams, Esquire
Law Office of Peter C. Williams
510 King Street, Suite 416
Alexandria, VA  22314
Counsel for the plaintiff

Ronald W. Stern, Esquire
801 N. Fairfax Street, Suite 106
Alexandria, VA  22314
Counsel for the defendant

A. Hugo Blankingship, Jr., Esquire
4020 University Drive, Suite 300
Fairfax, VA 22030
Co-counsel for the defendant